UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

BRIAN B., ET AL.

VERSUS

RICHARD STADLER, ET AL.

CIVIL ACTION

NO. 98-886-D

**MEMORANDUM OPINION**

This matter is before the court on a cross - claim filed by Correctional Services Corporation ("CSC") against the Department of Public Safety & Corrections ("DPSC"). The Court has carefully considered the trial briefs submitted by both the DPSC and by CSC. Pursuant to this Court's November 10, 2004 "Notice to Counsel," the DPSC and CSC have defined the issue before the Court as follows:

> Did the Cooperative Endeavor Agreement ("CEA") obligate the State of Louisiana to pay a contractual per diem assessment for housing 686 juveniles at Tallulah Correctional Center for Youth (now SCCY - Madison Parish Unit), even though there may have been compelling reasons not to house 686 juveniles at the facility?

For the purposes of this opinion, the following facts have been established relative to CSC's cross claim against DPSC.[1]

On February 24, 1994, the Department of Public Safety and Corrections for the State of Louisiana ("DPSC") and the City of Tallulah ("City") entered into a Cooperative

---

[1] The parties have stipulated to the admissibility and veracity of all dates in the chronology set forth in Tab A of the Joint Bench Book and all identities and titles of the individuals identified in Tab B of the same (but not relevancy). Furthermore the parties further stipulate to the admissibility of the documents collected under Tabs C, D, E, F and G of the Joint Bench Book.

1

Endeavor Agreement ("CEA")[2] under which the City agreed to build and maintain a facility to house juveniles adjudicated to the custody of the DPSC. The CEA was necessitated by the City's housing shortfalls for juveniles placed in the State's custody and by the City's inability to fund a new facility on its own.

The City subsequently assigned its rights and obligations under the CEA to Trans-American Development Associates, Inc. ("TADA"). TADA is a private corporation which, at the time, had no experience operating correctional facilities. TADA then contracted with GRW, Inc. to operate TCCY. However GRW was only able to operate TCCY for six weeks, during which a state of emergency was declared by this Court. Consequently, TADA assumed direct operation of the facility.[3]

At the time the facility opened in November 1994, the population cap was 362 juveniles, but this was increased to 476 juveniles with the opening of Phase II in November 1995.[4] On October 5, 1998, the court approved a population cap of 536 juveniles, which remained in place the entire time that CSC operated the facility.[5] TADA continued to operate TCCY until late 1998 with marginal success. During this time, the United States Department of Justice and private plaintiffs initiated separate law suits challenging the constitutionality of conditions at TCCY. Those actions were

---

[2] The CEA has been amended nine times. For purposes of this ruling, any reference to the CEA is as amended under the 8th amendment which was in effect during the period in which CSC operated TCCY. All amendments are collected under Tab D of the Joint Bench Brief.

[3] Chronology, Tab A of the Joint Bench Brief

[4] Chronology, Tab A of the Joint Bench Brief

[5] Tab C-5 of the Joint Bench Brief, Judge Polozola's Oct. 5, 1998 Order

consolidated with the then existing *Williams v. McKeithen*.[6] All of these actions were being litigated at the time CSC contracted to assume control of TCCY.

On December 14, 1998, CSC, a publicly traded corporation experienced in the management of juvenile correctional facilities, contracted to assume operational control of TCCY.[7] On December 9, 1998, TADA and CSC entered into a Subcontract, Facility Use Agreement, and Asset Purchase, in which responsibility for the operation of TCCY was assigned to CSC.[8] The Subcontract incorporated by reference the CEA, the City's assignment of the contract to TADA, the Management Services Agreement between TADA and the City, and other related agreements.[9]

The CEA, as amended and assigned to CSC provided, in pertinent part, as follows:

THIS AGREEMENT shall be subject to the following terms and conditions:

> 1. [T]he City[10], through its Mayor, hereby agrees to house at the Facility, or cause to be housed, adjudicated juveniles in the custody of the Department and to provide, or cause to be provided, programmatic services to such juveniles. **The Department agrees to maintain at all times, a population of not less than 386 adjudicated juveniles in Phase I and an additional 300 adjudicated juveniles in Phase II of the Facility when fully completed and operational.** . . . The Department's obligation to provide the minimum number of adjudicated juveniles in Phase II **shall begin when Phase II**

---

[6] CA 71-98

[7] CSC did not actually assume control of TCCY until January, 1999.

[8] Exhibit D -15; Chronology, Tab A

[9] Tab D, Joint Bench Book

[10] CSC is substituted for the City pursuant to the assignment.

>**is fully completed and operational**. The Department's obligation to provide the forgoing **minimum number** of adjudicated juveniles in the facility will be maintained for the duration of this Agreement, subject to the appropriation of funds.
>
>2. **For and in consideration of** the City housing or providing for the housing of such juvenile offenders in the Facility as provided in this Agreement, the Department **agrees to pay** the City a per diem rate of Fifty-two and 88/100 Dollars ($52.88) per day per juvenile offender during Phase I, subject to legislative appropriation. The Department agrees to pay to the City a per diem rate of Sixty-two and 88/100 Dollars ($62.88) per day per juvenile offender for all juvenile offenders housed at the Facility in Phase I and Phase II upon the completion and occupancy of any portion of Phase II of the Facility, subject to legislative appropriation.[11]

At the time CSC contracted to assume operational control of TCCY, the total population had been capped by order of Judge Polozola at 536 juveniles.[12] CSC became a party in the three aforementioned consolidated lawsuits when the private plaintiffs in the *Brian B.* litigation filed a Second Amended Complaint alleging that unconstitutional conditions continued even after CSC assumed control of the Facility.[13]

On September 22, 1999, CSC withdrew as operator of TCCY after approximately eight months in that capacity. Publicly, CSC stated its withdrawal was due to the failure of the state to commit the "anticipated" funding level. However, DPSC alludes to other reasons, such as CSC's failure to keep the facility operational, as the cause for

---

[11] Exhibit D -10, paragraphs 1 - 2, Joint Bench Book

[12] July 23, 1998 Order and October 2, 1998 Interim Agreement, Exhibits C-4 and C-5, Joint Bench Book

[13] Exhibit C -9

4

the withdrawal.[14] In any event, it is clear that DPSC was required to take over operational control of the Facility as a result of CSC's withdrawal.[15]

## ANALYSIS

CSC has now filed this cross claim in which it contends that the CEA obligates the State of Louisiana to pay a per diem assessment for the housing of 686 juveniles at TCCY even though 686 juveniles were never housed, and even though there may have been compelling reasons not to house 686 juveniles at the facility.

The issue before the Court is a matter of contract interpretation. Consequently, the general rules of contract interpretation apply. Among those maxims is that "when the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."[16] Furthermore, "a provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective."[17]

## I. CSC Cannot Place DPSC in Default

"A contract is bilateral or synallagmatic, when the parties obligate themselves reciprocally, so that the obligation of each party is correlative to the obligation of the other."[18] Reciprocal obligations are those that arise from bilateral or synallagmatic

---

[14] DPSC Original Brief on the Merits, p.7

[15] Exhibit E-22, Exhibit C-11, Joint Bench Book

[16] La. Civ. C. Art. 2046

[17] La. Civ. C. Art. 2049

[18] La. Civ. C. art. 1908

5

contracts.[19] CSC's obligation under the CEA was to "house juvenile offenders as provided in this Agreement." In consideration of CSC's obligation to provide "for the housing of such juvenile offenders in the Facility as provided in this Agreement," the DPSC obligated itself to pay the specified per diem rate for the offenders housed. Thus, the CEA creates reciprocal agreements between the parties.

Under La. Civ. Code art. 1993, "in case of reciprocal obligations, the obligor of one may not be put in default unless the obligor of the other has performed or is ready to perform his own obligation." In Vredenburgh v. Baton Rouge Sugar Co., the Louisiana Supreme Court expressed the necessity of the party seeking recovery for nonperformance of terms to have fulfilled their duty under a reciprocal contract.[20] Additionally, case law is well established that a party cannot elicit performance from another party when unable to perform himself.[21] These cases both address contract disputes comparable to the case at hand, in which a party is trying to collect on the contract but has failed to perform their own obligations.

### A. CSC Failed to Achieve Operational Capacity for 686 Juveniles

DPSC argues that the CSC did not meet its end of the bargain under the CEA; and, therefore, it cannot place DPSC in default.[22] DPSC points to the provisions of the CEA outlining the operational standards for the facility.[23] DPSC argues that CSC

---

[19] La. Civ. C. art. 1993, Comment (b)

[20] 28 So. 122, 124 (La. 1899); Darragh v. Vicknair, 52 So. 264, 266 (La. 1910).

[21] Alexandria & W. Ry. Co. v. Long Pine Lumber Co. of La., Inc., 93 So. 199, 200. (La. 1922)

[22] DPSC Original Brief on the Merits, p.8

[23] CSC is substituted for the City pursuant to the assignment.

cannot legally compel contractual performance because it failed to perform its contractual obligations.[24] That is, DPSC argues that CSC did not meet the criteria in paragraph 1 of the CEA, requiring that "not less than 386 . . . and an additional 300 adjudicated juveniles" be housed when the facility was "fully completed and operational."[25] DPSC concedes that the facility might have been complete but argues that the facility never achieved an operational capacity for 686 juveniles. Additionally, DPSC argues that the facility was at best operational for 536 juveniles, but during that time, the conditions were "dangerous."

    Having carefully reviewed the record, the court finds that DPSC is correct on this point. The record contains deposition testimony and expert reports which establish that operations at the facility were inadequate for 535 juveniles. The findings show that the facility was not prepared to ramp up for an additional 150 juveniles, due to employee turnover and increased need for programming as the number of juveniles housed at the facility increased.[26] Under CSC's control, the facility was dangerous and poorly run, according to expert reports on the conditions at the facility.[27] During February and March 1999, several months after CSC took over operations of the facility, Department of Justice experts evaluated the facility. These experts issued reports critical of the programming, education, mental health, and medical services available at the facility.

---

[24] La. Civ. Code art. 1993

[25] Tab D-10 of the Joint Benchbook

[26] Tabs F, G-1, G-3 and G-4 of the Joint Benchbook

[27] Joint Bench Book, Exhibits F-1 through F-7, DOJ and USDC Expert Reports

The court agrees with DPSC that, while the facility was physically completed, it was not operational or able to meet the needs of the juveniles housed there. CSC's failure to meet the operational requirements under the CEA precludes its ability to enforce the DPSC's reciprocal obligations.[28]

Moreover, the CSC was obligated to provide adequate housing and services for the correctional facility under the terms of the CEA. Paragraphs 7A and 11 of the CEA require that CSC run the facility according to the standards adopted by the state departmental regulations and those established by the American Correctional Association ("ACA"). Paragraph 7A provides that:

> The City shall operate and maintain . . . the Facility in accordance first with the appropriate standards adopted by the State and second pursuant to the standards established by the American Correctional Association, as such standards may be amended from time to time . . . The City agrees to enter, or cause to be entered, into a candidate status for America Correctional Association accreditation within ten (10) days of completion and occupancy of the facility. The City further agrees to receive accreditation within eighteen (18) months of obtaining the aforementioned candidate status.

Paragraph 11 reiterates the requirements that CSC meet the ACA requirements, as well as establishing monitoring and auditing guidance. A formal ACA audit could not be performed, but CSC failed to meet even the mandatory requirements necessary to gain accreditation, failing to meet their obligations under the contract.[29]

### B. CSC Abandoned its Duties as Operator

---

[28] La. Civ. C. art. 1993.

[29] DPSC Original Brief on the Merits, FN 34; Joint Bench Book, Exhibit E-14, 1999 Audit Report

Finally, DPSC argues that CSC materially breached the contract by abandoning its role as operator on September 21, 1999. According to DPSC, this abandonment negates any claim CSC might have to recover damages as an operator. In response, CSC argues that they did not abandon its role as an operator, but was told by Richard Stalder that DPSC intended to assume operational control, at which point CSC withdrew as operator of the facility.

Having carefully considered the arguments and the record on this point, the court finds that CSC abandoned its role as operator. DPSC had assumed control of the facility previously, in January 1995, without terminating CSC. In each instance, it did so as an emergency management procedure to cure a crisis situation.[30] There is no evidence to suggest that when DPSC assumed control on September 22, 1999 that the facility would not be returned to CSC after the operational defects were cured, as it had been in the past. Additionally, CSC's own press release on September 22, 1999 stated that CDC had "informed the state that it would not be feasible to continue to operate the facility." All of the evidence shows that it was CSC's choice to walk away from operation of the facility and not a mutual ending of the agreement. Therefore, given CSC's failure to perform their obligations under the CEA and their breach of the CEA by ending their operation of TCCY, CSC cannot put DPSC into default on its obligations.

## II. Assuming the CEA Set a Minimum Per Diem Based on 686 Prisoners, it Conflicts with Judge Polozola's Order

The court pretermits whether the CEA unambiguously set a minimum per diem

---

[30] DPSC Trial Brief, pp. 15; Tab G-3, deposition of R. Stalder

9

based on a figure of 686 juveniles. This provision was agreed upon prior to Judge Polozola's order of July 23, 1998, which effectively capped the population of TCCY at 536 adjudicated juvenile offenders.[31] Again, assuming that the DPSC was contractually obligated to pay for a minimum of 686 adjudicated juvenile offenders, such a requirement is in direct conflict with Judge Polozola's subsequent order that the facility could house no more than 536 offenders.[32]

The CEA provides for this contingency, as does the Louisiana Civil Code. Paragraph 11 of the CEA requires the facility to be run in accordance with "all applicable constitutional standards, federal, state and local laws and *court orders*." Under La Civil Code Art. 7, a contract cannot require the DPSC to take actions that would "derogate from laws enacted for the protection of the public interest."[33] Judge Polozola's order was put in place to address conditions at Louisiana juvenile facilities and concerns of constitutional violations. Increasing the population of TCCY above the 536 cap set by Judge Polozola's would have violated his order. It would have been in derogation of the public's interest and would possibly have led to unconstitutional conditions arising at TCCY.

The CEA states that "in the event any provision of this agreement shall be held illegal, invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate, render unenforceable or otherwise affect any other provision

---

[31] July 23, 1998 Order and October 2, 1998 Interim Agreement, Exhibits C-4 and C-5, Joint Bench Book

[32] Under the CEA, CSC was also required to comply with state and local laws as well as court orders. Joint Bench Book, Exhibit D-10, ¶ 11

[33] La. Civ. C. art. 7

thereof," essentially stating that one provision can be unenforceable without affecting the rest of the contract.[34]

In a case addressing application of an arbitration clause, the Fifth Circuit addressed the application of a severability clause with wording similar to paragraph 15 of the CEA.[35] The court found that the case did not involve a situation adequate to sever the offending section, but explained that it would come into play if a section was deemed "invalid" and that a severability clause permits a court to strike a "certain offensive term" from an otherwise valid agreement.[36] Furthermore, the Civil Code states that the "nullity of a provision does not render the whole contract null unless, from the nature of the provision or the intention of the parties, it can be presumed that the contract would not have been made without the null provision."[37] The Louisiana 2nd Circuit Court of Appeals has also stated, in a decision involving a similar severability clause, that such a clause "shows a clear intent of the parties to allow the remainder of the contract to remain in force" even if provisions were declared invalid.[38] Following the logic of these cases, the court finds that the severability clause in the CEA allows for striking the requirement for housing 686 juveniles but only to the extent that it is invalid and contrary to a court order.

Consequently, the court finds that even if the CEA set a per diem minimum floor

---

[34] Joint Bench Book, Exhibit D-10, ¶ 15

[35] Iberia Credit Bureau, Inc. v. Cingular Wireless LLC, 379 F.3d 159, 171 (5th Cir. 2004).

[36] Id. at 171.

[37] La. Civ. C. art. 2034

[38] Wied v. TRCM, LLC, 698 So.2d 685, 689 (La. App. 2 Cir.,1997)

11

of 686 juveniles, that provision would be invalid due to Judge Polozola's order. At best, such a per diem would be reduced to one based on 536 juveniles as provided in Polozola's order. However, as noted above, the court finds that CSC cannot place DPSC in default due to its failure to meet its bilateral obligations. Consequently, the court finds that CSC is not entitled to any additional sums under the contract in any event.

Accordingly, this court rules in favor of the DPSC finding that it does not owe CSC additional sums under the CEA based upon any contractual requirement for housing a minimum of 686 juveniles at the facility.

Baton Rouge, Louisiana, August, 2nd, 2005.

JAMES J. BRADY, JUDGE
MIDDLE DISTRICT OF LOUISIANA